Kevin S. Asfour (SBN 228993)
K&L Gates LLP
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone:  (310) 552-5000
Facsimile:  (310) 552-5001
Email: kevin.asfour@klgates.com

Peter Breslauer (*pro hac vice* to be filed)
MONTGOMERY MCCRACKEN
  WALKER & RHOADS LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103-7505
Telephone:  (215) 772-7271
Facsimile:  (215) 731-3733
Email: pbreslauer@mmwr.com

Attorneys for Defendant Valve
Corporation

*[Continued on Following Page]*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VALVE ANTITRUST LITIGATION | Case No. 2:24-mc-00006 |
| | *Miscellaneous Action Relating to W.D. Wash. Case No. 2:21-cv-00563-JCC* |
| | **JOINT STIPULATION OF DEFENDANT VALVE CORPORATION AND NON-PARTY RIOT GAMES, INC. IN CONNECTION WITH VALVE'S MOTION TO COMPEL RIOT GAMES, INC. TO PRODUCE DOCUMENTS AND DATA (L.R. 37-2.1)** |
| | C.D. Cal. Dates:<br>Hearing Date:     January 31, 2023<br>Hearing Time:     9:30 a.m. |
| | W.D. Wash. Dates:<br>Discovery c/o:    Nov. 30, 2023[1]<br>Pre-Trial Conf.:   Not yet set<br>Trial:                  Not yet set |

---

[1] The parties disagree as to whether the November 30 discovery cut-off applies to this motion.

**JOINT STIPULATION IN CONNECTION WITH MOTION TO COMPEL (L.R. 37-2.1)**

1

2

Lisa J. Demsky (SBN 186006)
MUNGER, TOLLES & OLSON LLP
350 S Grand Ave., Floor 50
Los Angeles, CA  90071
Phone:  (213) 683-9151
Email: lisa.demsky@mto.com

3

4

5

Attorneys for Riot Games, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JOINT STIPULATION RE. DISCOVERY DISPUTE PURSUANT TO L.R. 37-2.1**

# **TABLE OF CONTENTS**

I. INTRODUCTORY STATEMENTS ................................................................. 1

    A. Valve's Introductory Statement ................................................... 1

    B. Riot Games, Inc.'s Introductory Statement.................................... 4

II. SPECIFICATION OF THE ISSUE IN DISPUTE............................................ 7

    A. Valve's position ....................................................................... 7

        1. The Requested Documents and Data Are Relevant to the Case...... 9

        2. The Subpoena Does Not Impose an Undue Burden on Riot and is Proportional to the Needs of the Case ............................................ 10

        3. Plaintiffs' Allegations and Riot's Refusal to Produce Data on Its Game Distribution Revenue Show That Valve Has a Substantial Need for This Information ............................................................. 12

        4. The Stipulated Protective Orders in Valve Antitrust Litig. Adequately Safeguard Riot's Confidential Information............... 14

    B. Riot Games, Inc.'s Position........................................................ 15

        1. Valve's Motion to Compel is Untimely.................................... 16

            (a) *Valve Failed to Comply with the Local Rules of the Central District of California Prior to the Discovery Cut-Off*.................................................................... 17

            (b) *The December 1 Order Did Not Extend the Discovery Cut-Off*.................................................................... 20

            (c) *Valve Rejected Riot's Compromise Offer, and The Parties Never Reached A Compromise Resolution* ....... 22

        2. Valve's Discovery Requests are Unsupported by Substantial Need, Unduly Burdensome, and Not Relevant ........................................ 23

            (a) *Valve Failed to Demonstrate A Substantial Need for Non-Party Riot's Revenue Information* ......................... 23

            (b) *The Requested Confidential Information is Not Relevant Based on the Alleged Market and Statutory Period* ...... 26

            (c) *Valve's Requests for Confidential Information Are Unduly Burdensome* ...................................................... 27

        3. Additional Safeguards Are Necessary to Protect Riot's Confidential Commercial Information ......................................... 28

**i**

1    **I.    INTRODUCTORY STATEMENTS**

2        **A. Valve's Introductory Statement**

3        Faced with claims in the Western District of Washington, *In re Valve Antitrust*

4    *Litigation*, Civil Action No. 2:21-cv-00563-JCC (W.D. Wash.) ("*Valve Antitrust*

5    *Litig.*"), that it has monopolized or attempted to monopolize an alleged video games

6    distribution market for the past 20 years, Valve Corporation ("Valve") served

7    subpoenas on various video game companies, including Riot Games, Inc. ("Riot").

8    Valve's subpoena seeks sales data and documents about, *inter alia*, products, markets,

9    and competition that Valve will use to defend against Plaintiffs' allegations that Valve

10   has monopolized video game distribution through various restraints on competition.

11   But rather than working to comply with its obligations in response to a subpoena, Riot

12   has engaged in a series of maneuvers that repeatedly move the goalposts.

13       Specifically, Riot initially refused to even search for responsive documents for

14   months after receiving Valve's subpoena.  It then finally made an offer to produce

15   some data only in extremely broad ranges but then reneged on that offer after Valve

16   accepted it.  Most recently, Riot insisted that Valve should offer it more protection for

17   its data at trial, but then, when Valve agreed to additional protection, Riot backpedaled

18   and said it would produce even less than it had offered before.

19       Since serving the subpoena, Valve has made very significant concessions to

20   reach an accommodation with Riot, proposing that Riot produce only key sales

21   information that relates to sales in the United States and the rest of the world.  Indeed,

22   in October 2023, Valve offered to narrow its subpoena to the following request:

23           Total revenue in USD in each year, net of taxes, generated by all
             consumer spending games, in-game content, and DLC, or other revenue
24           received from monetization of Riot's products, stated separately for the
             US and the rest of the world, and disaggregated by whether the revenue
25           was attributed to PC, console, or mobile games or platforms.

26   Declaration of Peter Breslauer ("Breslauer Decl.") Ex. G.  In other words, aggregate

27   annual revenue data, stated separately for the U.S. and the rest of the world, derived

28   from three distribution channels:  PC, console, and mobile games or platforms.

**1**

Initially, and for many months after receiving Valve's subpoena, Riot refused to produce anything—asserting that its aggregate sales and revenue data for video games is so confidential and proprietary that the Stipulated Protective Order entered in *Valve Antitrust Litig.* (which provides for "Attorneys Eyes Only" designations and bars access by Valve personnel, including in-house counsel) fails to provide Riot with sufficient protection. *See* Breslauer Decl. ¶ 5, Ex. A. Nor has Riot found acceptable the Stipulated Supplemental Protective Order entered in *Valve Antitrust Litig.*, which provides additional protection for the data and documents of several other video game companies who have produced the same type of aggregate data to Valve that the subpoena to Riot requests. *Id.* ¶ 13, Ex. G.

After months of refusing to even search for responsive data, Riot offered to produce sales volume data stated in "ranges" of a quarter-*billion* dollars as follows:

> Riot is amenable to producing ranges of total revenue (quarter billion ranges, e.g. 250 – 500 million) "generated by all consumer spending games, in-game content, and DLC, or other revenue received from monetization of Riot's products, stated separately for the US and the rest of the world," annually for the last 10 years. Riot will produce this information on the condition that the production will end Riot's obligation to produce documents in response to Valve's requests.

Breslauer Decl. Ex. H. Riot refused to agree to narrower ranges. *Id.* ¶ 16.

On November 29, 2023, however, Valve agreed to accept Valve's proposal for quarter-billion-dollar ranges, but several hours later Riot's counsel announced that "circumstances have changed" and that "Riot's prior compromise [the quarter-billion-dollar ranges] is no longer on the table." *See* Breslauer Decl. Ex. I. Riot thus reneged on the proposal that it suggested (and Valve had accepted) and reverted to its initial, months'-long position of refusing to produce anything in response to the subpoena.[2]

---

[2] The November 30, 2023 fact discovery cut-off in *Valve Antitrust Litig.* was set in a Stipulated Motion to Modify Case Schedule, Dkt. # 130, at 2. On November 30, 2023, however, the parties in *Valve Antitrust Litig.* stipulated to an extension of fact discovery for certain fact depositions and also stipulated "that nonparties upon whom Plaintiffs or Defendant, prior to November 1, 2023, served subpoenas requesting production of documents or data may, if necessary, make their productions after November 30, 2023." The court in *Valve Antitrust Litig.* approved and entered that stipulation as an order of the court on December 1, 2023. *See* Breslauer Decl. Ex. F.

Because Riot reneged on its offer to produce data, Valve began the steps the Local Rules require before filing a Motion to Compel by sending Riot a draft Joint Stipulation on November 30, 2023.  Riot responded by pretending that the previous weeks of meet-and-confer sessions had never happened.  Its counsel asserted that, in their view, "Valve is not permitted to file a Motion to Compel" without first sending Riot a letter "requesting a pre-filing conference of counsel[,] identifying each discovery request and specifying the terms of the discovery order to be sought." Breslauer Decl. Ex. K.  This despite the multiple prior meet-and-confer sessions, during which Valve and Riot repeatedly discussed the data Valve was requesting— and despite Riot's having offered to produce a set of data that Riot itself identified, an offer that Riot reneged on after Valve accepted it.

In the interest of continuing to try to resolve the matter without involving the Court, Valve agreed to Riot's insistence on yet another conference, which took place on December 8, 2023.  At that conference, Riot confirmed that its earlier offer was "no longer on the table" because it wanted more protection for its data at trial. Breslauer Decl. ¶ 23.  But when Valve agreed to added protection, Riot moved the goalposts again.  Despite this added protection at trial, Riot, without any explanation, deleted the non-U.S. data from what it had agreed to produce before.  *Id*. ¶¶ 24-26.

In a follow-up meet-and-confer session on December 20, 2023, Riot's counsel acknowledged that Riot was now offering U.S.-only data, despite its earlier proposal of U.S. and rest-of-world data.  Breslauer Decl. ¶ 27.  She suggested that (a) she was not sure she could get in touch with her client over the holidays for further discussions and (b) perhaps Valve should wait to see if the plaintiffs in *Valve Antitrust Litig.* ultimately pursue allegations of a relevant market that is broader than the United States before revisiting Valve's request for rest-of-world data.  *Id.*  In other words, the goalposts moved again.

This type of gamesmanship requires Court involvement.

### B. <u>Riot Games, Inc.'s Introductory Statement</u>

Valve's Motion to Compel is untimely, as it was filed past the November 30, 2023 discovery cut-off due to Valve's nearly year-long delay in bringing the dispute to court. Valve served a subpoena duces tecum on non-party Riot on January 18, 2023, seeking expansive categories of highly sensitive non-public documents with no tailoring. Riot served its response to that subpoena on **February 1, 2023**, declining to provide any of the information due to numerous objections, including that the requests were vastly overbroad, unduly burdensome, harassing, and improper. Declaration of Lisa Demsky ("Demsky Dec.") ¶ 2. Contrary to Valve's mischaracterizations, Riot continuously asserted and stood on its objections. This motion should be rejected out of hand as untimely and, even if considered on the merits, should fail.

At Valve's request, Riot met and conferred on February 23, March 14, May 15, and June 9, each time reiterating Riot's initial objections. During those calls, Riot repeatedly informed Valve of Riot's position that the requests improperly sought highly sensitive commercial information and were, among other things, overbroad and unduly burdensome, especially in light of Riot's non-party status and Valve's status as a competitor of Riot. Riot also asked Valve to articulate Valve's substantial need for Riot's confidential information, given the availability of public sources, the information already received from public companies, the lack of any allegations concerning Riot, and the risk that this information will end up in competitors' hands or in the public, through trial or other filings. While Valve stated that it would like to obtain information to support its experts' analyses, it failed to identify any relevant issue in the action that *required* the information sought. Demsky Dec. ¶ 3, Ex. 1.

Riot reiterated these objections in a July 21, 2023 email to which Valve never responded. *Id.* Valve did not reach out again until October 20. Riot and Valve spoke on October 25, when Riot reiterated its objections to the requests, including that the information was highly confidential and not relevant based on the pleaded marketplace. Riot proposed an agreement that neither Plaintiffs nor Valve would seek

**4**

to introduce Riot's confidential material in a manner that would result in disclosure outside the Protective Order, a proposal Valve *never* agreed to.  Instead, Valve offered on October 27 to use "best efforts to avoid asking to disclose" Riot's information.  *Id.* ¶ 4.  On October 30, Valve also shared a Rule 30(b)(6) deposition subpoena for November 29 at 10:00 AM to authenticate any documents produced by Riot.  *Id.* ¶ 5.  Valve's counsel informed Riot's counsel that there was a November 30 discovery cut-off, which was the reason for the November 29 document authentication date.  *Id.* ¶ 6.

On November 6, 2023, Riot offered a compromise proposal to compile and produce ranges of revenue information if the production ended any alleged obligation to produce documents, and the parties agreed to certain additional protections above those in the protective orders.  Riot also proposed having an individual sign a business records declaration instead of a deposition for authentication.  Demsky Dec. ¶ 7, Ex. 4.  Valve rejected this offer on November 10.  *Id*. ¶ 8.

On November 14, Valve proposed Riot produce smaller ranges of revenue data.  Due to Riot decision-makers' limited availability until the conclusion of the League of Legends World Championship on November 19, Riot was unable to consider and respond to this offer until November 22, when Riot rejected Valve's proposal.  While it re-stated its current amenability to the offer made on November 6, it did not state the offer would be open indefinitely, and it stated that if no documents were produced there would be no need for the November 29 deposition.  *Id*. ¶ 9, Ex. 5.  Valve did not respond to this proposal until a week later, after the time set for Valve's Rule 30(b)(6) deposition had passed.  Later on November 29, Valve contacted Riot and attempted to accept the expired proposal.  Riot informed Valve the same day that the proposal was no longer open and it would stand on its objections.  *Id*. ¶ 10, Ex. 6.

In the late afternoon of November 30, Valve informed Riot by phone of its intent to file a motion to compel that same evening in response to Riot's objections served on February 1, 2023.  Valve's counsel stated that he had a November 30 deadline to file a motion due to the discovery cut-off in the case.  Prior to that time,

**5**

Valve had not complied with any of the Central District Local Rules.  For example, Valve had not requested a pre-filing conference of counsel identifying each discovery request and specifying the terms of the discovery order to be sought, nor had it provided any portion of a Joint Stipulation.  Local Rule 37-1; Demsky Dec. ¶ 11.  Riot informed Valve that Valve had not complied with the Local Rules, and that Riot did not waive the Rule 37 requirements, including at least 7 days to prepare its portion of a Joint Stipulation.  Demsky Dec. ¶ 11, Ex. 7.  Nonetheless, Valve sent a partial draft Joint Stipulation (with no exhibits or declarations) at 9:55 PM on November 30 and demanded Riot provide its portion, an hour later, by 11:00 PM *that same day*.  Riot responded within the hour, declining to stipulate to Valve's filing of an improper and non-compliant motion without giving Riot time to include its portion.  *Id*. ¶ 12, Ex. 8.

Valve did not provide the rest of its draft Joint Stipulation or request a pre-filing conference until December 1, *after* the discovery cut-off in the action.  Riot agreed to a conference to discuss the untimeliness of Valve's motion, as no prior meeting had addressed this topic.  *Id.*; *Id.*, Ex 8.  Valve and Riot conferred on December 8 and, based on Valve's misrepresentation that the Court had eliminated the November 30 discovery cut-off, Riot discussed the merits of Valve's requests.  *Id.* ¶ 14.  After Valve provided the order, dated December 1, Riot realized that the Court had *not* eliminated the November 30 discovery cut-off, except for certain specified depositions (not including Riot's).  The parties had additional communications but did not reach agreement.  On a December 20 call, Riot reiterated to Valve that any motion would be untimely and pointed out that the December 1 order did *not* extend the discovery cut-off.  Riot's counsel asked Valve if there was any other order it claimed extended the discovery cut-off, but Valve did not provide anything and instead sent a Joint Stipulation initiating this motion.  *Id.* ¶ 16.  Valve engaged in nearly a year of inexcusable delay, and its motion should be denied as untimely and on the merits.

## II.    SPECIFICATION OF THE ISSUE IN DISPUTE

### A. Valve's position

The subpoena Valve served on Riot requested many categories of documents and data, but after the meet-and-confer process and Riot's steadfast refusal to produce anything, Valve agreed to narrow its request to a single category of data:

> Total revenue in USD in each year, net of taxes, generated by all consumer spending games, in-game content, and DLC, or other revenue received from monetization of Riot's products, stated separately for the US and the rest of the world, and disaggregated by whether the revenue was attributed to PC, console, or mobile games or platforms.

*See* Breslauer Decl. Ex. G.

The litigation underlying the subpoena arises out of Plaintiffs' allegations of anticompetitive conduct against Valve, which was founded in 1996 as a developer of video games.  Consolidated Second Amended Complaint ("Compl.") (*Valve Antitrust Litig.* Dkt. # 127) (Breslauer Decl. Ex. C) ¶ 46.  According to Plaintiffs' account, which Valve disputes, Valve has had a "stranglehold on the PC gaming market" since 2004, shortly after Valve began distributing games through its Steam platform.  *Id.* ¶ 50.  Plaintiffs also allege, but Valve denies, that Valve is the world's largest distributor of PC games, holding approximately 75% of an alleged PC video game distribution market.  *See id.* ¶ 56; Answer to Compl., *Valve Antitrust Litig.* Dkt. # 128 (Breslauer Decl. Ex. D) ¶ 56.  Plaintiffs allege a class encompassing video game publishers who sold a game through Steam during the class period where either (1) the publisher was based in the United States or its territories or (2) the publisher sold games through Steam to consumers in the United States.  Compl. ¶ 375.

Plaintiffs' proposed class definition alleges a geographic market "*at least as broad* as the United States."  Compl. ¶ 122 (emphasis added).  This indistinct market definition means Plaintiffs seek a geographic market that is at a minimum the United States but might be broader and potentially worldwide.

1      The purpose for seeking game sales information is straightforward:  Valve

2   seeks to rebut Plaintiffs' allegation that Valve has allegedly monopolized game

3   distribution for nearly twenty years, and to do so Valve seeks data on sales by leading

4   game companies, like Riot and others, so it can determine the overall size of the

5   market and Valve's share.  At least ten other video game companies have produced

6   data and documents to Valve in response to similar subpoenas, but Riot has refused to

7   produce anything but the extremely broad quarter-billion-dollar ranges of U.S.

8   revenue data.  Breslauer Decl. ¶¶ 15-17, 25-26.

9      Riot objected to the subpoena in its entirety as overbroad, unduly burdensome

10   and seeking confidential and proprietary information.  *See* Breslauer Decl. Ex. B.

11   Valve engaged in numerous meet-and-confer sessions over the objections, but Riot

12   steadfastly refused to produce anything, *see id.* Ex. G—until November 6, 2023, when

13   it made its first offer to produce any data, namely revenue data stated as quarter-

14   billion-dollar ranges (*e.g.*, "between $0 and $250,000,000" or "between $250,000,000

15   and $500,000,000").  *Id.* Ex. H.

16      After unsuccessfully seeking production of the requested data in narrower, $50

17   million ranges, Valve agreed to accept Riot's proposal of revenue data in quarter-

18   billion-dollar ranges on November 29, 2023.  Breslauer Decl. Ex. I.  But less than 12

19   hours later, Riot reneged on its proposal, claiming that "circumstances have changed"

20   because, in a separate and then-ongoing trial in San Francisco in *In re Google Play*

21   *Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.), "Riot's highly confidential

22   documents were shown in open court today over Riot's objection and despite Riot's

23   motion to seal."  Breslauer Decl. Ex. I.  Riot's counsel stated, "Riot's prior

24   compromise proposal is no longer on the table."  *Id.*

25      Riot's counsel did not identify what types of documents had apparently been

26   shown in court on November 29 in *In re Google Play Store Antitrust Litig.* "over

27   Riot's objection and despite Riot's motion to seal[,]" but the docket in that case shows

28   that Riot filed an Administrative Motion to Seal Highly Confidential Information in

that case two days earlier, on November 27, 2023 [ECF No. 811].  A copy of that Motion to Seal and its Proposed Order are attached to the Breslauer Decl. as Ex. J.

As is clear from the Motion to Seal it filed in *In re Google Play Store Antitrust Litig.*, what Riot was attempting to keep sealed during that trial were five internal documents describing its "negotiation strategy," its "business and financial analysis" of an agreement with Google, and its "technical and engineering capabilities"—not past years' aggregated revenue data.

> ### 1.  The Requested Documents and Data Are Relevant to the Case

Plaintiffs' core allegations in *Valve Antitrust Litig.*, which Valve disputes, are that Valve monopolized at least the U.S., and possibly a broader, market for game distribution, and that its conduct has suppressed competition and forced video game publishers to sell software at artificially high prices.  Information related to software sales on and off Valve's "Steam" distribution platform is at the heart of the case, for purposes of rebutting Plaintiffs' allegations of monopolization, market definition, and restraint of competition.

Other courts have required production of the type of objective sales and revenue data Valve is seeking here.  The court in *In re Apple iPhone Antitrust Litigation* granted a motion to compel and enforced Apple's requests for this type of sales and revenue data.  In that antitrust case, which challenged Apple's App Store policies, Apple sought discovery of "Samsung's revenue from apps, in-app products, and in-app advertising, and the number of apps submitted by developers for production in the Galaxy Store," 2020 WL 5993223, at *7-8, "reports concerning downloads of apps, submissions by app developers for the Galaxy Store, and sales of apps and in-app products," *id*. at *9, and "how many [Samsung handheld devices with Galaxy Store preinstalled] were sold each year since 2009," *id.* at *10.  The court enforced those requests because (a) the information sought "would likely be relevant to showing the extent of competition between the App Store and Galaxy Store"; (b) the information wasn't available elsewhere; and (c) the requests did "not detail future plans or involve

**9**

strategic assessments" and thus did not pose a "substantial risk of competitive …
harm." *Id.* at *7-10.

Likewise, the court in *In re eBay Seller Antitrust Litig.*, 2009 WL 5205961
(W.D. Wash. Dec. 23, 2009), explained that, while it would not enforce defendant
eBay's subpoena to non-party Amazon to the extent it would require Amazon to
produce its own internal market analyses, it had "ordered Amazon to produce a host of
objective information about its third-party sales platforms and its payment systems[,]"
including Amazon's pricing information, that had enabled eBay's expert "to construct
a historical model of Amazon's offerings in the relevant markets as well as the prices
for those offerings." *Id.* at *2. The data Valve is seeking to compel Riot to produce
here is precisely the type of "objective information" the court in *In re eBay Seller
Antitrust Litig.* required be produced—even from a competitor.

Indeed, Riot's steadfast resistance to producing even its annual aggregate
revenue data—because it views Valve as a "direct competitor"—shows why, properly
protected under "Confidential" or "Attorneys Eyes Only" designations, this data is
relevant to Valve's defenses to Plaintiffs' claims that Valve has been monopolizing an
alleged PC games distribution market since 2004. Riot possesses unique and relevant
information. Just as other video game companies possess unique information about
their businesses, Riot possesses information about its own sales—information that it
admits is unavailable anywhere else because Riot does not release it publicly. To create
a picture of the relevant market that is sufficiently detailed and accurate, Valve must
compose a mosaic, gathering material from a variety of companies.

### 2. The Subpoena Does Not Impose an Undue Burden on Riot and is Proportional to the Needs of the Case

Riot's undue burden argument boils down to an objection that Valve requested
a large amount of information. But the requested information is reasonably related to
the issues in this case and is the kind of information a large company in the video
game industry is likely to have accessible. *See F.D.I.C. v. Garner*, 126 F.3d 1138,

**10**

1146 (9th Cir. 1997) ("Although the FDIC's requests are extensive, we cannot hold that the subpoenas are overbroad or unduly burdensome absent a showing by Appellants of additional support for this position.").  Valve's requests in the subpoena have been scaled back to the bare minimum.  They are not unreasonable or burdensome—an objection Riot effectively waived when it agreed to produce data it in ranges on November 6 and November 22, but then reneged on without claiming burden.

Although the Sherman Act and the Washington Consumer Protection Act have four-year statutes of limitations, information about the market long before then is important to rebut Plaintiffs' allegations that Valve somehow obtained market power in 2004, almost from Steam's inception.  According to Plaintiffs, Valve took its first steps towards market consolidation in 2001 when it allegedly acquired the World Opponent Network and achieved and exercised market power in 2004 when it "forced" consumers to download Steam in order to play Valve's successful Half-Life 2 game.  Compl. ¶¶ 47-50.  While Valve denies these allegations, that is the time span in Plaintiffs' complaint, and Valve is not free to ignore it in favor of a shortened period of Riot's choosing.

Valve requires the data it has sought from Riot and others to assess Plaintiffs' allegations of the scope and size of the relevant market, Valve's share, and whether Plaintiffs' allegations defining a product market are legally viable.  Valve's narrowed request for Riot's aggregate annual sales data (as described above) is focused on obtaining evidence to rebut Plaintiffs' allegations of monopolization since 2004.  It is thus clearly proportional to the issues at stake in *Valve Antitrust Litig*.

Moreover, Plaintiffs' proposed class definition alleges a geographic market "*at least as broad* as the United States."  Compl. ¶ 122 (emphasis added).  That paragraph goes on to allege that "Valve distributes games for sale over the internet, and Steam is available anywhere in the world to a user with an internet connection."  *Id.*  This market definition means Plaintiffs seek a geographic market that is at a minimum the

**11**

United States but might be worldwide.  Indeed, many other paragraphs of the complaint invoke the alleged worldwide scope of the video-game business and Valve's activity in it.  *See id.* ¶¶ 1 ("Personal computer ('PC') games, a subset of video games, alone generate at least $30 billion worldwide annually."), 3 ("Steam is by far the largest PC game store in the United States (and the world) . . ."), 38 ("As of 2021, there are roughly 3 billion video game players worldwide."), 127 ("Steam hosts games from developers all over the world, and the Steam Workshop, a community content marketplace, includes contributors from 75 countries."), 380(f) (alleging as common issue "[w]hether Valve has substantially foreclosed competition in the market for PC game distribution in the United States and worldwide"), & 430 ("As alleged herein, Valve has attempted to monopolize or has monopolized the worldwide PC game distribution market.").

Valve's subpoena therefore appropriately seeks data for Riot's sales both to purchasers in the United States and to purchasers in the rest of the world—but it is limited to aggregate data stated separately for the United States and for the rest of the world.

### 3. Plaintiffs' Allegations and Riot's Refusal to Produce Data on Its Game Distribution Revenue Show That Valve Has a Substantial Need for This Information

Plaintiffs' Second Amended Complaint in *Valve Antitrust Litig.* alleges that Valve has had a "stranglehold on the PC gaming market" since 2004, shortly after Valve began distributing games through its Steam platform.  Compl., Breslauer Decl. Ex. C ¶ 50.  Plaintiffs also allege that Valve is the world's largest distributor of PC games, holding approximately 75% of an alleged PC video game distribution market. *See id.* ¶ 56; Answer to Compl., Breslauer Decl. Ex. C ¶ 56.

The games sales and revenue data Valve is seeking from Riot and other video game companies will help Valve and its experts demonstrate that there is vigorous competition in the market for the distribution of video games.

Riot's steadfast insistence that even its aggregated sales and revenue data is highly confidential because it views Valve as a "direct competitor" shows that this data is not available from any other source—because Riot does not voluntarily publicize it.

Riot's explanation on November 29, 2023 for reneging on its offer to produce data in quarter-billion-dollar ranges was that some of its "highly confidential documents were shown in open court today over Riot's objection and despite Riot's motion to seal" in the separate and ongoing trial in *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.).  *See* Breslauer Decl. Ex. I.  That decision, however, by a federal judge presiding over a separate antitrust case, is no basis to obtain complete immunity from discovery here.

First, as is clear from the Motion to Seal that Riot filed in *In re Google Play Store Antitrust Litig.*, *see* Breslauer Decl. Ex. J, the five documents it wanted the court to seal during the trial in that case were internal documents describing Riot's "negotiation strategy," its "business and financial analysis" of an agreement with Google, and its "technical and engineering capabilities"—documents far more competitively and strategically sensitive than the aggregated annual sales and revenue data that Valve is seeking here.

Second, Riot suggests that because the trial judge in a separate case apparently declined to seal his courtroom or permit only the jury to see certain competitively sensitive documents during the trial of that case, Riot should not have to produce different materials—here data, not competitively sensitive strategy documents—in response to Valve's subpoena in this case. That flies in the face of the discovery rules and the obligation of every subpoenaed non-party to produce discoverable documents in response to a subpoena.

Valve has a substantial need for the data it is seeking from Riot, and Riot cannot run from its discovery obligations because some other documents, in another case, were disclosed.

### 4. The Stipulated Protective Orders in Valve Antitrust Litig. Adequately Safeguard Riot's Confidential Information

Valve's subpoena does not seek customer records, a list of any of Riot's customers, or any type of internal analysis or negotiation strategy. The narrowed document request is directed at aggregated, deidentified data showing revenue in separate distribution channels. To the extent Valve's subpoena seeks information Riot considers commercially sensitive, the Stipulated Protective Order that the Court entered in *Valve Antitrust Litig.* is available to protect that information. *See* Stipulated Protective Order, included in Ex. A to Breslauer Decl. As that Order provides, Riot can mark any documents produced in response to Valve's subpoena as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL — ATTORNEY'S EYES ONLY" if they meet the Protective Order's criteria. *See id.* at 3. Those documents can only be reviewed by outside counsel, outside experts and consultants. Notably, they *cannot* be reviewed by the receiving party's personnel, including the receiving party's in-house counsel.

Moreover, in response to Riot's continued assertions that the Stipulated Protective Order would not adequately protect its confidential information, Valve offered the same Stipulated Supplemental Protective Order that several other subpoenaed video game companies agreed would suffice when they produced similar data to Valve and Plaintiffs in *Valve Antitrust Litig.* *See* Stipulated Supplemental Protective Order, Breslauer Decl. Ex. G. That Stipulated Supplemental Protective Order provides additional protections against disclosure of "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY" documents and a procedure for notice and objections if a party desires to introduce any such documents at trial. Indeed, Valve and Plaintiffs further agreed that they will use their best efforts *to avoid asking to disclose at trial*, outside of the group permitted under the Stipulated Supplemental Protective Order, Riot's confidential information in a non-aggregated

1  form that specifically identifies Riot.  On November 6, 2023, Riot's counsel said that

2  protection was acceptable to Riot.  *See* Breslauer Decl. Ex. H.

3       Valve tailored its subpoena to seek important information a video game

4  company is likely to have.  Valve sought to meet and confer to learn what information

5  Riot actually has and what it could reasonably produce.  Valve substantially narrowed

6  its requests.  But Riot has not reciprocated.  Instead, it reneged on its initial offer of

7  U.S. and rest-of-world data in $250-million bins.  Then, when Valve offered

8  additional protection for Riot's data at trial, Riot backpedaled and offered $250-

9  million bins of U.S. data only.

10       Valve respectfully requests that the Court grant this Motion to Compel and

11  order Riot to produce documents, including data in actual dollar terms (not ranges),

12  responsive to Valve's narrowed request:

13

14  > Total revenue in USD in each year, net of taxes, generated by all
> consumer spending games, in-game content, and DLC, or other revenue
> received from monetization of Riot's products, stated separately for the
> US and the rest of the world, and disaggregated by whether the revenue

15  > was attributed to PC, console, or mobile games or platforms.

16

17  **B. <u>Riot Games, Inc.'s Position</u>**

18       Valve's Motion to Compel is untimely and should be denied on that basis.

19  Valve delayed until nine months after Riot served its objections and until after the

20  discovery cut-off in the Washington action before initiating the process for this

21  Motion to Compel.  Valve has repeatedly flouted the Central District of California

22  Local Rules, and now attempts to blame-shift by complaining that Riot would not

23  agree to prejudice its own interests by waiving those rules.  Valve's accusations of

24  Riot moving the goal posts are both misplaced and not relevant given its failure to

25  bring a timely motion, comply with this Court's procedure, or address Riot's valid

26  objections and concerns about Valve's requests.  For example, Valve has never agreed

27  unequivocally to prevent Riot's confidential information from being shown to in-

28  house personnel at Valve, which is Riot's competitor.  The relevant facts are that

Valve served a third-party subpoena on Riot on January 18, 2023; Riot served its objections on February 1, 2023; despite repeated meet-and-confers and correspondence the parties were not able to agree on a compromise resolution; and Valve engaged in months of delay and waited until it was too late to seek judicial intervention.

Riot has consistently objected to the information sought and refused to provide it on the grounds that the requests sought highly confidential and commercially sensitive information and were vastly overbroad, unduly burdensome, harassing, and improper. During a brief period, Riot offered a narrow compromise, but Valve rejected that offer and then attempted belatedly to revive it.

Even if this Court were to consider Valve's untimely Motion, it fails on the merits as well. Riot and Valve have different business models, and Valve has not made any showing as to its substantial need for the information, especially given the market allegations in the operative complaint. Valve has failed to meet its burden for compelling this highly confidential information from a non-party competitor, and it is not only irrelevant to the claims and defenses in this action but producing it is unduly burdensome.

### 1. Valve's Motion to Compel is Untimely

"Untimeliness is sufficient ground, standing alone, to deny a discovery motion." *Wyles v. Sussman*, 445 F. Supp. 3d 751, 755 (C.D. Cal. 2020) (citation omitted). The Local Rules of the Western District of Washington, in which this action resides, require that "[a]ny motion to compel discovery [] be filed and served on or before the discovery deadline." W.D. Wash. Local Rule 16(b)(3). Although Valve was required to file its motion in the Central District of California, where Riot resides, that does not eliminate the substantive governing deadlines in its case in the Western District of Washington. In this jurisdiction, too, the Local Rules demand the timely filing of discovery motions and establish that, "the failure to file [a motion] within the

JOINT STIPULATION IN CONNECTION WITH MOTION TO COMPEL (L.R. 37-2.1)

deadline, may be deemed consent to the . . . denial of the motion." C.D. Cal. Local Rule 7-12.

The original fact discovery cut-off in this action was October 31, 2023, and the modified case scheduling order issued on May 2, 2023 extended the close of fact discovery to November 30, 2023. Demsky Dec. ¶ 5, Ex. 3. On the afternoon of December 1, after Valve had stated its intent to file a motion to compel, Riot's counsel confirmed with the Chambers of the Honorable John Coughenour where this case is pending that the fact discovery cut-off was indeed on November 30, 2023 and had passed as of the time of that call. Demsky Dec. ¶ 13. The Court's Chambers confirmed that the Local Rules would prohibit Valve's Motion to Compel filed after that date. *Id.*

Valve served its subpoena, including 28 document requests,[3] to non-party Riot on January 18, 2023. Riot timely served its objections and response to Valve's discovery requests on February 1, 2023, and renewed its objections repeatedly during meet-and-confers with outside counsel for Valve throughout the spring and summer of 2023. Indeed, Valve admits that Riot repeatedly reiterated its objections and conveyed to Valve that it would not search for the documents requested in the subpoena based on those objections. *See supra*, Section I.A. Yet Valve did not substantively respond to those objections or attempt to seek a resolution until late October, one month before its discovery cut-off.

> *(a) Valve Failed to Comply with the Local Rules of the Central District of California Prior to the Discovery Cut-Off*

Valve failed to comply with the Local Rules for bringing a discovery motion, despite having Riot's responses for over eight months. Per Local Rule 37-1, Valve

---

[3] Valve's document requests included requests for Riot's internal strategic considerations and analyses regarding distribution, Riot's market research for its games, Riot's internal policies regarding software pricing, and detailed, global revenue information for software, in addition to other highly sensitive information.

was required to precede any discovery motion with a letter requesting a conference, and then a conference. The Rule requires that the moving party's letter "identify each issue and/or discovery request in dispute, state briefly as to each such issue/request the moving party's position (and provide any legal authority the moving party believes is dispositive of the dispute as to that issue/request), and specify the terms of the discovery order to be sought." Local Rule 37-1. Following that conference, a party must provide its portion of a Joint Stipulation, which must be accompanied by all exhibits and declarations, and then it must provide the opposing party at least seven days to respond with its portion of the Joint Stipulation. Local Rule 37-2.2. All of this must occur prior to filing any motion. *Id.* It is the responsibility of a party bringing a motion to account for these timetables and plan accordingly to make sure they have complied with all of the Rule's requirements with sufficient time to file by any deadlines. *Id.* There is nothing in the Rules that permits a party to sidestep these requirements because of perceived ongoing exchanges of proposals.

Valve's accusations of Riot's delay are simply an unfounded attempt to obfuscate Valve's own inexcusable delay. As the history outlined above makes clear, Valve never sent a letter requesting a pre-filing conference in the nearly eleven months following the service of its subpoena, and made no request for such conference until December 1, 2023, after the discovery cut-off. Nor did Valve ever address each point raised in Riot's February 1 response and the legal authority for its Motion to Compel in the conferences in October and November that Valve argues satisfy this requirement. Similarly, Valve did not even attempt to provide any portion of a Joint Stipulation until 9:55 PM on November 30, 2023, and even then it was incomplete, as Valve did not provide its exhibits and declaration until December 1, 2023. Local Rule 37-2.2 entitles Riot to seven days to respond to Valve's portion of the Joint Stipulation after receiving it, along with all declarations and exhibits.

Although Valve's portion of this Joint Stipulation seems to treat the Local Rules as mere formalities that do not matter, and suggests Riot's compliance with the

Rules is somehow a form of gamesmanship, there obviously are good reasons for the Rules.  For example, although the parties had participated in a number of calls prior to December 1, Valve had never specifically identified for Riot what relief it might seek in a motion to compel.  Nor had there been any prior meet-and-confer discussions about the timeliness of Valve's Motion or whether Valve had timely complied with the requirements of the Local Rules.  And of course, the seven-day period for the responding party is necessary to ensure each side is able to present its position fairly.  In any event, regardless of Valve's opinion of the Local Rules, the Rules are clear, and Valve – like every other party litigating in the Central District of California – had the ability to review them and comply with them in advance of the discovery deadline but chose not to.

Even if Valve requested a Local Rule 37-1 pre-filing conference prior to providing this Joint Stipulation (which it did not), or even if the conversations prior to December 1 could take the place of a Local Rule 37-1 pre-filing conference (which they cannot), Valve still did not provide its complete portion of the Joint Stipulation until December 1, after the November 30 cut-off.  Because of Valve's delay in providing its portion of a Joint Stipulation, the earliest Valve would have been able to file a motion to compel discovery after giving Riot seven days to prepare its portion would have been December 8, eight days after the cut-off.  Valve's provision of a partial draft Joint Stipulation at 9:55 P.M. on the day of the discovery cut-off, without providing the declaration or exhibits referenced therein, without the parties conducting a Rule 37-1 conference, and with a demand for Riot's response an hour later at 11:00 P.M. clearly violates the Local Rules.  Courts recognize that the Local Rules are not mere formalities and have denied motions for delay less egregious than Valve's here.  *See Nicholson v. City of Los Angeles*, 2017 WL 10574522, at *5-6 (C.D. Cal. Jan. 11, 2017) (denying motion to compel responses where party commenced process for filing discovery motion under Local Rule 37 four days prior to discovery cut-off).

In its conversation with Riot's counsel on November 30, Valve's counsel admitted that the discovery cut-off was November 30, and that it understood that to be its Motion to Compel deadline, and that was why Valve was trying to rush Riot to provide its portion of the Joint Stipulation the same day.  Demsky Dec. ¶ 11.  At that point, however, it was too late, because Valve had not complied with any of the required precursors to filing a motion.

### (b) The December 1 Order Did Not Extend the Discovery Cut-Off

Valve's subsequent attempt to pretend that it had not missed its cut-off is unavailing.  Although outside counsel for Valve alleged to Riot on December 8, *over a week after the discovery cut-off*, that the November 30 deadline had been extended, the Court's discovery order that Valve later provided to Riot's counsel does no such thing.  The Stipulation and Order Valve points to – filed on December 1, after the November 30 cut-off (the "December 1 Stipulation and Order") – extends the deposition cut-off only for certain, specified third-party depositions, not including the custodian of records deposition of Riot, to December 15, 2023.  Breslauer Dec.¶ 9, Ex. F, at ¶ 4.

The December 1 Stipulation and Order is titled "Stipulated Motion for Extension of Deadline to *Take Certain Depositions*."  Breslauer Dec. ¶ 9, Ex. F. (emphasis added).  It states the parties "jointly request that the Court extend until December 15, 2023 the *deadline within which to conduct the following, specified depositions*."  *Id.*, a ¶ 4 (emphasis added).  It requests "that the Court enter the below Order *extending the deadline to complete depositions of fact witnesses* as stipulated."  *Id.*, a ¶ 7 (emphasis added).  Clearly, the parties only requested from the Court that it extend the cut-off for the specified fact depositions, which did not include Riot's deposition, and that is the Order the Court granted.

In a December 20 conversation, when Riot's counsel pointed out that the December 1 Stipulation and Order did not actually extend the discovery cut-off

**20**

beyond November 30, Valve's counsel pointed to paragraph 5, contained in the stipulation portion of the document (not the Order portion), that states, "[t]he parties agree that nonparties upon whom Plaintiffs or Defendant, prior to November 1, 2023, served subpoenas requesting production of documents or data may, if necessary, make their productions after November 30, 2023." Breslauer Dec.¶ 9, Ex. F, at ¶ 5. Unlike the paragraphs that specifically ask the Court to enter an order extending the discovery cut-off for enumerated depositions, this paragraph does not ask the Court to approve of the parties' agreement, does not ask the Court to enter an Order approving of the parties' agreement, and does not ask the Court to extend any existing deadlines.

Instead, paragraph 5 represents only the parties' agreement stated in permissive, not mandatory terms. In other words, the parties were agreeing that third parties served before November 1 who were already going to produce documents could have more than 30 days to produce documents if they needed the extra time ("if necessary"). By agreeing that third parties "may" produce documents after November 30, at best the parties were agreeing that they would not object to documents being received by third parties after November 30. Nothing in the December 1 Stipulation and Order requests or grants an extension of the fact discovery cut-off for anything other than the specifically identified fact depositions, nor does it extend the cut-off for bringing motions to compel, which had passed on November 30.

Paragraph 7 clearly describes the Order being entered as relating only to "the deadline to complete depositions of fact witnesses as stipulated." *Id.*, at ¶ 7. Valve's suggestion that paragraph 5 – which does not reference the Court, ask for Court approval, or reference an Order – can somehow be read as vacating the discovery cut-off contained in the May 2, 2023 Order for any and all third-party discovery sent prior to November 1 is flatly inconsistent with the language of the document and, at best, disingenuous. It is inconceivable that paragraph 5 of the stipulation, not incorporated into the Order or referenced in paragraph 7, could be interpreted as a completely open-ended extension of the discovery cut-off, with no new deadline being set.

JOINT STIPULATION IN CONNECTION WITH MOTION TO COMPEL (L.R. 37-2.1)

Nothing in the Court's Order extends the deadline for bringing a discovery motion, which the Local Rules in the jurisdiction of the underlying action establish as the discovery deadline.  W.D. Wash. Local Rule 16(b)(3) ("Any motion to compel discovery shall be filed and served on or before the discovery deadline.").  Valve's suggestion that an agreement between Valve and the Plaintiffs somehow changes the discovery cut-off, and therefore the deadline to file a discovery motion, is simply wrong.  The rules governing Valve's case in the Western District of Washington make clear that a motion to compel may not be brought after the discovery cut-off.  There is nothing that allows Valve to circumvent this rule by bringing its Motion in the Central District of California, which also prohibits untimely motions.

Valve simply did not commence the Motion to Compel process in a timely manner, and on that basis, their motion should be denied.  *Wyles v. Sussman*, 445 F. Supp. 3d 751, 755 (C.D. Cal. 2020) (citation omitted) ("Untimeliness is sufficient ground, standing alone, to deny a discovery motion."); C.D. Cal. Local Rule 7-12 ("[T]he failure to file [a motion] within the deadline, may be deemed consent to the . . . denial of the motion.").

### *(c) Valve Rejected Riot's Compromise Offer, and The Parties Never Reached A Compromise Resolution*

Valve places a lot of emphasis on Riot's supposed revoking of an offer, suggesting that Riot was somehow at fault for Valve's nearly year-long delay in attempting to bring a motion to compel, but Valve's recitation of the facts is both misleading and irrelevant.  When – in response to Valve's late October re-initiation of discussions – Riot made a narrow compromise offer on November 6, Valve *rejected it* on November 10.  Valve then made a counter-offer on November 14.  Riot rejected that counter-offer on November 22.  At that time, Riot suggested it would still be amenable to the November 6 offer but without an agreement to produce documents, it assumed the November 29 deposition would be off calendar.  Valve then let another

full week pass and did not attempt to accept the November 6 offer – which it had already rejected – until November 29, after the time for the authentication of records deposition Riot had referenced in its November 22 email.  That same day, Riot made clear that the November 6 offer was no longer on the table.  Even under Valve's story (where it thought Riot's November 22 email had unconditionally and without time limitations revived a rejected offer), it did not try to accept this offer until November 29, and Riot made clear that same day (seven hours later) that the offer was not still open.  Riot did not engage in any gamesmanship here.  It promptly corrected Valve's misunderstanding, and this "moving of the goalpost" accounts for a mere seven hours of time in Valve's nearly year-long delay.

Despite Riot specifically identifying Valve's untimeliness as the issue Riot wanted to discuss in the parties' Rule 37 conference of counsel, and despite Riot's counsel informing Valve's counsel on December 8 and again on December 20 that any motion would be untimely, Valve chose to initiate this Motion without even addressing its untimeliness.  Valve points to no authority that would permit it to file a motion to compel after its deadline has passed.  Valve's Motion should be denied on that basis.

### 2.  Valve's Discovery Requests are Unsupported by Substantial Need, Unduly Burdensome, and Not Relevant

#### (a) Valve Failed to Demonstrate A Substantial Need for Non-Party Riot's Revenue Information

Even if Valve's Motion to Compel had been timely, which it was not, Valve has not demonstrated a "substantial need" for Riot's highly competitively sensitive revenue data and documents that does not bear directly on the relevant marketplace allegations in the operative complaint.  The revenue information Valve seeks from Riot is commercial information protected by Federal Rule of Civil Procedure 45(d)(3)(B)(i) and has **never** been made public by Riot.  As such, Valve must

demonstrate that it has a "substantial need for the testimony or material that cannot be otherwise met without undue hardship; and ensures that subpoenaed person will be reasonably compensated."  Fed. R. Civ. P. Rule 45(d)(3)(C)(i) & (ii).  Valve has not made this showing.

As courts have made clear, that a competitor's information might be helpful in an antitrust case does not create a "substantial need."  A party has substantial need for information where their claim or defense "virtually rise or falls with the admission or exclusion of the proffered evidence." *Edwards v. California Dairies, Inc.*, No. 1:14–mc–00007–SAB, 2014 WL 2465934, at *5 (E.D. Cal. June 2, 2014) (citation omitted).  Valve is not entitled to Riot's information based on a desire to mount its most "fulsome defense" when it can mount a defense without it.  *In re eBay Seller Antitrust Litig.*, No. C09–735RAJ, 2009 WL 5205961, at *3–4 (W.D. Wash. Dec. 23, 2009) (quashing subpoena to third-party competitor in antitrust case where third party's competitively sensitive information was "at best, marginally more valuable than the evidence already in eBay's possession" and much of the information could be obtained from other sources); *see In re Apple iPhone Antitrust Litig.,* No. 11-cv-06714-YGR (TSH), 2020 WL 5993223, at *4–12 (N.D. Cal. Oct. 9, 2020) (applying "substantial need" standard to quash document requests to third party where requesting party failed to demonstrate it was unable to obtain it through its own competitive intelligence efforts).

Riot's revenue data is not necessary to Valve's defense, given the allegations in the operative complaint and the marketplace alleged in the operative complaint (the "PC game distribution market").  Valve and Riot have different business models.  As Riot has repeatedly informed Valve, aside from the relatively few Riot Forge titles that Riot only began distributing in and around 2021, Riot's games are free to play, so there is no revenue from the sale of those games.  Instead, Riot's revenue stems largely from in-game cosmetic transactions from a small percentage of players.  And unlike Valve, Riot does not sell third party games on its platforms. *See* Declaration of

**24**

Dan Nabel ("Nabel Dec.") ¶ 3.  Valve clearly intends to argue for a larger market definition in the underlying action so that its share of the marketplace appears smaller, but Riot's revenue information would be an apples-to-oranges comparison.  Although Valve's experts might want this additional information, Valve's defense certainly does not rise or fall on it.  Valve is not entitled to go on fishing expeditions for confidential information of non-parties in a wishful attempt to mount its most "fulsome defense." *In re eBay Seller Antitrust Litig.*, No. C09–735RAJ, 2009 WL 5205961, at *3–4. There is no basis – let alone a substantial need – for Riot's revenue information, which is not based on the sale of third-party video games.

Nor does Valve's speculation about a possible attempt to certify a class based on foreign revenue establish a "substantial need" for Riot's non-U.S. revenue data. Riot understands and Valve admits, that Plaintiffs have defined the geographic scope of the market in this action as the "PC game distribution market" that is "at least as broad as the United States," Breslauer Dec.¶ 7, Ex. C, at ¶ 91, and that no class – let alone a class that includes non-U.S. sales – has been certified.

Valve has represented that it has received publicly available information and significant revenue information from other market participants, many of whom are public companies who distribute third-party games (unlike the private Riot).  Demsky Dec. ¶ 14.  It has not, however, detailed what that information is, or explained how the information Valve already obtained was so inadequate as to create a "substantial need" for Riot's particular confidential revenue data when repeatedly asked in conference and via written correspondence.  Valve has also failed to identify why its experts could not utilize the market evidence, or evidence regarding Riot's success or marketplace presence generally using metrics like number of players, that is already in Valve's possession, available from publicly available sources, or obtained from other market participants, including market participants that are public companies with less concern about providing data.  Instead, Valve has simply stated that its experts want this additional information to conduct analyses aimed at speculative classes.  This is

**25**

not enough.  *See generally Edwards*, No. 1:14–mc–00007–SAB, 2014 WL 2465934, at \*5 (concluding party lacks substantial need for financial data from non-party based on data's limited relevance to the market at issue); *In re Ebay*, No. C09–735RAJ, 2009 WL 5205961, at \*3 (reasoning that where requested information was not necessary to mount any defense, there was no substantial need).  Valve's late commencement of this discovery motion, *after* the time allotted for discovery, undermines its claim that Riot's information is essential to its defense.  *See Amini Innovation Corp. v. McFerran Home Furnishings*, 300 F.R.D. 406, 411 (C.D. Cal. 2014) (reasoning that party's delay in seeking non-party information undercuts its relevance argument).

Despite its well-founded objections, and Valve's steadfast refusal to explain why Riot's particular revenue information is necessary to its case, as a compromise, Riot proposed that it could produce ranges of total U.S. revenue (within $250 million ranges) generated annually by all consumer spending games, in-game content, and DLC, or other revenue received from monetization of Riot's products for the last ten years, subject to certain protections.  Even though this compromise would have required Riot to create and compile information that does not currently exist in that format, Riot was open to providing broad ranges of data to resolve this dispute.  Valve initiated this motion, therefore, due to its insistence on non-U.S. sales information from Riot, despite having nothing more than a vague, speculative justification for it.

*(b) The Requested Confidential Information is Not Relevant Based on the Alleged Market and Statutory Period*

For the same reasons Valve cannot show substantial need, Valve's requests are not sufficiently relevant to its claims or defenses to warrant compelling discovery from a non-party.  Fed. R. Civ. P. 26(b)(1).  The "standards for non-party discovery require a stronger showing of relevance than for party discovery."  *In re Domestic Drywall Antitrust Litigation*, 300 F.R.D. 234, 240 (E.D. Pa. 2014); *see Gonzales v.*

*Google, Inc.*, 234 F.R.D. 674, 680 (N.D. Cal. 2006) (recognizing that discovery is more limited when a non-party is the target).  The information Valve seeks in its Motion to Compel remains overly broad as it calls for confidential financial information unrelated to the relevant market.  In fact, it is broader than the information in any of the proposals Valve purports to have accepted from Riot.  *See, e.g.*, Breslauer Dec. ¶ 15.  Riot does not participate in the market for the sale of third party games pleaded in the Complaint and, for the same reasons discussed in Section II.B.2(a), the information sought from Riot is not relevant.  The higher standard for discovery from a non-party does not permit Valve to scour the earth for global revenue information from competitors for a market that is not at issue.

### *(c) Valve's Requests for Confidential Information Are Unduly Burdensome*

Valve's requests are also unduly burdensome and will cause serious competitive harm to Riot.  Valve continues to demand that Riot disaggregate its total revenue information based on whether the revenue was attributed to PC, console, or mobile games or platforms.  The information requested by Valve is not maintained in the format requested by Valve and thereby necessitates an interrogatory-like response or that Riot create documents that do not otherwise exist, which Valve is not permitted to do through a document request.  Valve is not permitted to serve interrogatories on Riot, a non-party, and Valve has missed its deadline to seek a deposition from Riot.  And as Riot has repeatedly raised in meet-and-confers, there is no way to provide the requested information without revealing highly confidential commercial information that has never been made public.

Valve is a direct competitor, and Riot has only a few games, with only one game distributed during most of the requested time period.  Despite numerous calls where Riot expressed its concerns about its information being shown to Valve insiders or revealed to the public and other competitors, Valve has never agreed to Riot's

October 25 proposal that it not seek to introduce Riot's highly confidential commercial information at trial or otherwise in a manner that would result in disclosure.  Sharing Riot's financial history and sales data would allow Valve, and potentially other competitors if the information is disclosed in a disaggregated form, to understand the contours of Riot's business model, and would create significant competitive disadvantages for Riot.  *See* Nabel Dec. ¶¶ 4-5.

Furthermore, Valve has not narrowed the temporal scope of its request from that in the subpoena and continues to seek two decades' worth of detailed data that is not related to the relevant product market despite the fact that Riot was not in existence during that time and despite Valve's prior acceptance of ten years of data.  While Valve presumably will say it is willing to accept ten years, their requests for twenty years demonstrate the lack of effort to tailor Valve's requests to any specific substantial need.  Indeed, as the Sherman Act and the Washington Consumer Protection Act have four-year statutes of limitations, the requested information is well outside the statutory period.  Valve has not demonstrated that the requested materials are reasonably calculated to lead to information relating to distribution behaviors of game companies during the period of the alleged conspiracy, nor have they shown that the revenue for one game specifically addresses this subject matter.

### 3.  Additional Safeguards Are Necessary to Protect Riot's Confidential Commercial Information

Valve has mischaracterized Riot's concerns about protecting the confidentiality of its information.  Although the Stipulated Supplemental Protective Order provides additional protections against disclosure of "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY" documents, it does not prevent the disclosure of Riot's highly confidential commercial information at trial.  For instance, because Riot primarily sells in-game content, and not games themselves, if Valve introduces revenue information that distinguishes between companies with in-game and other content sales, Riot's confidential information would be discernable despite Riot not

**28**

being specifically identified.  Riot has specifically discussed its concerns that Riot's information would be shared with insiders at Valve and other competitors if used at trial, and that Courts are not bound by the protective orders when deciding what to permit in open court, and whether to maintain documents under seal at trial and after trial.  As such, Riot requested that Valve and Plaintiffs commit to not introducing Riot's confidential information, outside of the group permitted under the Stipulated Supplemental Protective Order, at trial or in open court in a non-aggregated form that permits identification of Riot.  Valve has never agreed to this condition.

Riot had reiterated this concern to Valve, even before the recent trial in the *In re: Google Play Store Antitrust Litigation* (Case No. 3:21-md-02981-JD) (J., Donato) in the Northern District of California, where Riot's confidential information was produced subject to an outside counsel-only protective order.  In that case, despite assurances Riot had received from the parties, Riot's confidential, "Attorneys Eyes Only" information was ultimately introduced in open court.  Due to the timing of the presentation at trial, Riot was not afforded an opportunity to be heard on the matter prior to this highly sensitive information being made public.  The concern, which Riot's counsel had previously discussed with Valve, was that a protective order, regardless of how strict, does not extend its protections to trial, and that at trial even highly confidential outside counsel-only information could become public despite the discovery protective orders.  So, when this concern – which Riot had repeatedly articulated to Valve's counsel – came to fruition, it pointed this out to Valve's counsel.

Valve's counsel suggests that Riot referenced the Google/Epic trial because it was somehow concerned that the same type of information that was made public through the Google/Epic trial would be made public here, but that was not Riot's concern.  The information Valve is requesting that Riot produce here was not produced in the Google/Epic litigation and has not been produced in any litigation.  Its confidentiality remains completely intact, and it is closely guarded, even within Riot.

Like the internal strategy analysis at issue in the Google/Epic case, Riot's global revenue information is highly sensitive and its disclosure would competitively harm Riot. *See* Nabel Dec. ¶¶ 4-5.

In response to Riot's repeatedly raised concerns, Valve ultimately proposed the following:

> Valve agrees that, when presenting its case-in-chief, it will not disclose Riot's data in non-aggregated, specifically identified form except to specified, permitted recipients as defined in the applicable protective orders. To the extent Valve must disclose Riot's non-aggregated, specifically identified data for another reason (e.g., impeachment), Valve agrees to use its best efforts to prevent that data from being disclosed to non-permitted recipients. "Best efforts" includes moving to seal any portion of an otherwise public record or proceedings that would disclose this information.

Breslauer Dec.¶ 24.  Riot accepted these proposed protections for the U.S. sales ranges it proposed providing, and Valve was willing to provide these proposed protections for all of the sales information requested.  The parties and Riot are therefore in agreement that these safeguards pose no undue burden.  If the Court considers Valve's belatedly filed motion and determines that some information must be provided, any order requiring that production should be subject to the protections proposed by Valve and accepted by Riot, and limited to Riot's annual revenue information (in ranges of $250 million) generated by consumer spending games, in-game content, and DLC, or other revenue received from monetization of Riot's products, for the U.S. for the last ten years.

**JOINT STIPULATION IN CONNECTION WITH MOTION TO COMPEL (L.R. 37-2.1)**

Respectfully submitted,

Dated:  January 9, 2024          By:  /s/ Kevin S. Asfour
                                     Kevin S. Asfour
                                     K&L GATES LLP

                                     Peter Breslauer
                                     MONTGOMERY MCCRACKEN
                                      WALKER & RHOADS LLP

                                     *Attorneys for Valve Corporation*

Dated:  January 9, 2024          By:  /s/ Lisa J. Demsky*
                                     Lisa J. Demsky
                                     MUNGER, TOLLES & OLSON

                                     *Attorney for Riot Games, Inc.*

## L.R. 5-4.3.4(2)(i) ATTESTATION

* Pursuant to L.R. 5-4.3.4(2)(i), the undersigned e-filer hereby attests that all other signatories to this document have authorized the application of their signature(s) thereon and concurred in its filing.

Dated:  January 9, 2024          By:  /s/ Kevin S. Asfour
                                     Kevin S. Asfour
                                     K&L GATES LLP

                                     *Attorneys for Valve Corporation*

**31**