Kevin S. Asfour (SBN 228993)
K&L Gates LLP
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone: (310) 552-5000
Facsimile: (310) 552-5001
Email: kevin.asfour@klgates.com

Peter Breslauer (*pro hac vice* to be filed)
MONTGOMERY MCCRACKEN
  WALKER & RHOADS LLP
1735 Market Street, 21st Floor
Philadelphia, PA 19103-7505
Telephone: (215) 772-7271
Facsimile: (215) 731-3733
Email: pbreslauer@mmwr.com

Attorneys for Defendant Valve
Corporation

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: VALVE ANTITRUST LITIGATION | Case No. 2:24-mc-00006<br><br>*Miscellaneous Action Relating to W.D. Wash. Case No. 2:21-cv-00563-JCC*<br><br>**DECLARATION OF PETER BRESLAUER IN SUPPORT OF VALVE'S MOTION TO COMPEL RIOT GAMES, INC. TO PRODUCE DOCUMENTS AND DATA (L.R. 37-2.1)** |

**DECLARATION OF PETER BRESLAUER**

I, Peter Breslauer, declare as follows:

1. I am an attorney admitted to practice in the Commonwealth of Pennsylvania and one of the attorneys representing Valve Corporation ("Valve") in *In re Valve Antitrust Litigation*, Case No. 2:21-cv-00563-JCC, pending in the United States District Court for the Western District of Washington ("*Valve Antitrust Litig.*"), where I am admitted *pro hac vice*.

2. I am submitting this declaration in support of Valve's Motion to Compel Riot Games, Inc. In short, and as described below, this Motion to Compel is necessary because Riot Games, Inc. ("Riot") has repeatedly insisted on moving the goalposts in an effort to avoid its obligations to comply with a lawful subpoena.

3. More specifically, Riot initially refused to even search for responsive documents for months after receiving Valve's subpoena. It then finally made an offer to produce some revenue data stated in extremely broad ranges, but reneged on that offer after Valve accepted it. Most recently, Riot insisted that Valve should offer it more protection for its data at trial, but when Valve met Riot's demand, Riot again backtracked, removing all non-U.S. revenue data from its prior commitment to produce data for on a worldwide basis. This is improper gamesmanship and necessitates court involvement that Valve sought to avoid.

### Valve's Subpoena

4. In January 2023, Valve served a subpoena ("Subpoena"), issued in Case No. 2:21-cv-00563-JCC, on Riot. A true and correct copy of the Subpoena is attached hereto as Exhibit A.

5. Along with the Subpoena, Valve sent to Riot a copy of the Stipulated Protective Order entered in *Valve Antitrust Litig*. *See* Exhibit A. That Protective Order gives nonparties like Riot the opportunity to limit disclosure of the nonparty's confidential business documents and the information contained in them to Valve's and the Plaintiffs' outside counsel, experts, and consultants for use in this case, but not

1 Valve's or the Plaintiffs' employees, including in-house counsel, by designating those
2 documents "Highly Confidential – Attorney's Eyes Only."

3       6.     On February 1, 2023, Riot served a lengthy set of objections to the
4 Subpoena, pursuant to which it would not produce any of the documents or data that
5 Valve requested. A true and correct copy of Riot's objections is attached hereto as
6 Exhibit B.

7       7.     A true and correct copy of the Consolidated Second Amended Complaint
8 in *Valve Antitrust Litig.*, Case No. 2:21-cv-00563-JCC is attached hereto as Exhibit C.
9 A true and correct copy of Valve's Answer and Affirmative Defenses to Consolidated
10 Second Amended Complaint is attached hereto as Exhibit D.

11       8.     Under the Scheduling Order in place in *Valve Antitrust Litig.*, the
12 deadline for completing fact discovery was November 30, 2023. *See* Stipulated
13 Motion to Modify Case Schedule, *Valve Antitrust Litig.* Dkt. # 130, at 2, a true and
14 correct copy of which is attached as Exhibit E.

15       9.     On November 30, 2023, the parties in *Valve Antitrust Litig.* stipulated to
16 an extension of fact discovery for certain specified fact depositions and also stipulated
17 "that nonparties upon whom Plaintiffs or Defendant, prior to November 1, 2023,
18 served subpoenas requesting production of documents or data may, if necessary, make
19 their productions after November 30, 2023." A true and correct copy of this
20 Stipulation, which the court in *Valve Antitrust Litig.* approved and entered as an order
21 of the court on December 1, 2023, is attached hereto as Exhibit F.

22       **Riot Initially Refuses to Produce Any Documents or Data**

23       10.    Between February 2023 and early November 2023, I took part in a series
24 of meet-and-confer sessions with Riot's counsel, Lisa Demsky, Esq., of the law firm
25 Munger, Tolles & Olson LLP. Jessica Laird, Esq., also of Munger, Tolles & Olson
26 LLP, attended several of these sessions.

27       11.    In the meet-and-confer sessions, Riot's counsel, echoing Riot's
28 objections, repeatedly asserted that Valve's Subpoena sought documents that were not

relevant to the issues raised by *Valve Antitrust Litig.*, would impose an undue burden on Riot, and would require production of highly confidential documents and data that Valve had not demonstrated a substantial need to obtain.

12. Since serving the Subpoena, Valve has made significant concessions to reach an accommodation with Riot, narrowing its requests to key sales and volume information relating to Riot's business in the United States and the rest of the world. On October 24, 2023, Valve offered to narrow the requests in the Subpoena to the following request:

> Total revenue in USD in each year, net of taxes, generated by all consumer spending games, in-game content, and DLC, or other revenue received from monetization of Riot's products, stated separately for the US and the rest of the world, and disaggregated by whether the revenue was attributed to PC, console, or mobile games or platforms.

A true and correct copy of the email thread culminating in my email of October 24, 2023 making that proposal is attached here as Exhibit G.

13. Initially, and for many months after receiving the Subpoena, Riot did not offer to produce anything—asserting that its aggregate sales and revenue data for video games is so confidential and proprietary that neither (1) the Stipulated Protective Order entered in *Valve Antitrust Litig.* (which provides for "Attorneys Eyes Only" designations that bar access by the parties' personnel, including its in-house counsel), nor (2) the Stipulated Supplemental Protective Order entered to provide additional protection for the data and documents of several other video game companies who have produced this type of aggregate data to Valve, would provide sufficient protection to Riot.[1]

14. At least ten other companies have produced data and documents to Valve in response to similar subpoenas, but Riot refused to produce anything.

---

[1] I sent a copy of one of the Stipulated Supplemental Protective Orders to Riot with Valve's October 24, 2023 proposal. *See* Exhibit G.

**3**
**DECLARATION OF PETER BRESLAUER**

**Riot Makes—Then Reneges On—Its Initial Offer**

15. After months of refusing to even search for responsive data, Riot made its first offer of production on November 6, 2023: it would produce revenue data stated within extremely large, quarter-*billion*-dollar "ranges." Riot proposed the following:

> Riot is amenable to producing ranges of total revenue (quarter billion ranges, e.g. 250 – 500 million) "generated by all consumer spending games, in-game content, and DLC, or other revenue received from monetization of Riot's products, stated separately for the US and the rest of the world," annually for the last 10 years. Riot will produce this information on the condition that the production will end Riot's obligation to produce documents in response to Valve's requests.

A true and correct copy of the email thread culminating in that offer is attached hereto as Exhibit H.

16. On November 10, 2023, Valve responded that quarter-billion ranges were too large, and on November 14, Valve proposed that the revenue data be produced in smaller ranges of $50 million. On November 22, 2023, Riot refused to narrow the ranges. A true and correct copy of the email thread containing these communications is attached hereto as Exhibit I.

17. On November 29, 2023, Valve agreed to Riot's proposal of revenue data in quarter-billion-dollar ranges. However, later that same day, Riot's counsel informed me that "circumstances have changed" and that "Riot's prior compromise is no longer on the table." *See* Exhibit I.

18. Riot's counsel's explanation for withdrawing its offer was that some of its "highly confidential documents were shown in open court today over Riot's objection and despite Riot's motion to seal" in the separate and then-ongoing trial in San Francisco in *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.). *See* Exhibit I.

19. A true and correct copy of the Motion to Seal and its Proposed Order that Riot filed on November 27, 2023 in *In re Google Play Store Antitrust Litig.*, No. 3:21-

**4**
**DECLARATION OF PETER BRESLAUER**

md-02981-JD (N.D. Cal.), is attached hereto as Exhibit J. That motion shows the types of documents Riot was attempting to keep under seal in that trial are internal Riot communications regarding its business strategies—not aggregated past data, reported in extremely broad ranges, that Riot had agreed to produce in the proposal it made and then reneged on.

**Riot Declares That It Is Too Late for Valve
to File a Motion to Compel and Requests That Valve Commit
<u>Not to Use Riot's Data in Identifiable Form at Trial</u>**

20. In light of Riot's abrupt reneging on its offer to produce ranges of data, Valve determined that it likely would need to file a Motion to Compel. It started that process on November 30 by sending Riot's counsel a draft of the Joint Stipulation that L.R. 37-2 requires a moving party to prepare and send to an opposing party as a prerequisite to filing a Motion to Compel.

21. Despite the multiple prior meet-and-confer sessions I had already had with Riot's counsel, during which we repeatedly discussed the data Valve was requesting—and despite Riot's having offered to produce a set of data that Riot itself identified (an offer that Riot withdrew after Valve accepted it)—Riot's counsel responded that, in their view, "Valve is not permitted to file a Motion to Compel" without first sending Riot a letter "requesting a pre-filing conference of counsel[,] identifying each discovery request and specifying the terms of the discovery order to be sought." A true and correct copy of the email thread containing my exchanges with Riot's counsel on November 30, 2023 and December 1, 2023 is attached hereto as Exhibit K.

22. In the interest of continuing to try to resolve the matter without involving the Court, Valve agreed to Riot's insistence on yet another conference, which was held on December 8, 2023.

**5
DECLARATION OF PETER BRESLAUER**

**Riot Demands Additional Protections for Its Data at Trial and Then, When Valve Agrees, Riot Offers to Produce <u>Less Data Than It Had Previously Offered</u>**

23. During the pre-filing conference on December 8, 2023, Riot's counsel asserted that Riot's earlier offer to produce revenue data in quarter-billion-dollar ranges was still "no longer on the table," because the court in *In re Google Play Store Antitrust Litig.* had allowed the disclosure of certain of Riot's confidential internal documents at the trial in that case. Although Riot had previously agreed to Valve's undertaking to use its "best efforts to avoid asking to disclose any information Riot produces outside of the groups permitted by the protective orders," *see* Exhibit H, Riot now demanded additional protection and suggested that Valve make another proposal—in effect, negotiate against itself.

24. On December 14, 2023, Valve did offer Riot additional protection and made the following proposal regarding disclosure:

> Valve agrees that, when presenting its case-in-chief, it will not disclose Riot's data in non-aggregated, specifically identified form except to specified, permitted recipients as defined in the applicable protective orders. To the extent Valve must disclose Riot's non-aggregated, specifically identified data for another reason (e.g., impeachment), Valve agrees to use its best efforts to prevent that data from being disclosed to non-permitted recipients. "Best efforts" includes moving to seal any portion of an otherwise public record or proceedings that would disclose this information.

Valve further confirmed that "To avoid any doubt, by 'Riot's Data' we mean Riot's numbers as reported in $250 million intervals that you previously outlined."

25. On December 15, 2023, Riot's counsel responded to the new proposal as follows:

> Thank you for this proposal. Riot is willing to produce U.S. sales revenue under the proposal you lay out below (including the assurances below and $250M ranges). Please let us know if that is agreeable to Valve and Plaintiffs.

A true and correct copy of the email thread containing Valve's new proposal and Riot's response is attached hereto as Exhibit L.

26. Without any explanation, Riot cut back the scope of its offer to "U.S. sales revenue" from what it had previously agreed to: revenue data "stated separately for the US and the rest of the world[.]" *See* Exhibit H.

27. In a follow-up meet-and-confer session on December 20, 2023, Riot's counsel acknowledged that Riot was now offering U.S.-only data, despite its earlier offer—to which Valve had agreed—of U.S. and rest-of-world data. Riot's counsel suggested that (a) she was not sure she could get in touch with her client over the holidays for further discussions and (b) perhaps Valve should wait to see if the Plaintiffs in *Valve Antitrust Litig.* ultimately pursue allegations of a relevant market that is broader than the United States before revisiting Valve's request for rest-of-world data.

28. Riot's repeated moving of the goalposts in its dealings with Valve about Valve's Subpoena is improper and warrants an order compelling Riot to produce the set of data Value said it would accept in its October 24, 2023 narrowed proposal:

> Total revenue in USD in each year, net of taxes, generated by all consumer spending games, in-game content, and DLC, or other revenue received from monetization of Riot's products, stated separately for the US and the rest of the world, and disaggregated by whether the revenue was attributed to PC, console, or mobile games or platforms.

*See* Exhibit G.

29. I declare under penalty of perjury that the foregoing is true and correct. Executed on January 8, 2024.

Peter Breslauer

---

7

**DECLARATION OF PETER BRESLAUER**